IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN TOUART, | ) | CASE NO. 1:12-cv-00733 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Kathleen Touart ("Plaintiff" or "Touart") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a

Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I.  Procedural History

Touart filed applications for Disability Insurance Benefits ("DIB") and Supplemental

Security Income ("SSI) on August 16, 2007, alleging a disability onset date of June 1, 2006.[2]  Tr.

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013.  Pursuant to FED. R. CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

[2] Touart had previously been receiving social security disability but benefits were terminated in June 2006.  Tr. 134, 321.  It is not entirely clear why Plaintiff's benefits were terminated.  However, in 2007 she reported to her psychiatrist that her benefits were terminated because she did not continue counseling.  Tr. 321.

85-88, 118-127, 134.  She alleged disability based on hepatitis C, depression, and arthritis.[3]  Tr.
89, 92, 98, 102, 139.  After initial denial by the state agency (Tr.89-91, 92-94), and denial upon
reconsideration (Tr. 102-103, 104-110), Touart requested a hearing (Tr. 111).  On February 24,
2010, an administrative hearing was held before Administrative Law Judge Richard Staples
("ALJ"). Tr. 14-45.

In his April 2, 2010, decision, the ALJ determined that Touart had not been under a
disability from June 1, 2006, through the date of the ALJ's decision.  Tr. 46-58.  Touart
requested review of the ALJ's decision by the Appeals Council.  Tr. 7-9.  On February 12, 2012,
the Appeals Council denied Touart's request for review, making the ALJ's decision the final
decision of the Commissioner.  Tr. 1-6.

## II. Evidence

**A.    Personal and Vocational Evidence**

Touart was born on July 28, 1956.  Tr.  118.  She completed the tenth grade and has a
GED.  Tr. 204, 466.  She is divorced and has two children.  Tr. 204.  At the time of the hearing,
Touart lived with her daughter and her daughter's three minor children.  Tr. 25.  Her most recent
employment included work in 2001-2002 as a housekeeping cleaner and a hospital cleaner.[4]  Tr.
140, 165.

**B.    Medical Evidence**

      **1.    Treatment Records**

           **a.  Hepatitis C**

---

[3] Touart also has a history of polysubstance dependence/abuse and she has self-reported that her alcohol use has
been in remission since April 2007.  Tr. 50-51, 202, 205, 220, 224, 226, 231, 243, 455.

[4] She also has worked as a laborer, shipping packer and fast food restaurant manager/assistant.  Tr. 140, 165.

Plaintiff began treatment for her hepatitis C on or about October 26, 2007.[5]  Tr. 310.

Her treatment involved interferon injections and ribavirin pills.  Tr. 310, 312-314, 315-317, 318-

320, 323-325, 352, 356.

When Plaintiff started her hepatitis C treatment, she weighed 102 pounds, 11.2 ounces.

Tr. 310.  After her first treatment, Plaintiff's weight dropped to 99 pounds, 11.2 ounces.  Tr. 312.

She reported that she experienced muscle and bone pain following the initial interferon injection

but also indicated that the pain gradually improved.  Tr. 312.  She reported insomnia and

irritability.  Tr. 312.  After the second week of treatment, Plaintiff's weight was back up 2

pounds.  Tr. 315.  She reported feeling fatigued, in part due to lack of sleep.  Tr. 315.  She

reported that she was in an abusive living situation; her daughter's boyfriend had thrown her

across the room and she now had no place to live.  Tr. 315.  Plaintiff had no bleeding and no

visible signs of infection.  Tr. 315.  After week three, Plaintiff's weight had stabilized, her

appetite was better, she was feeling much better, her living situation had improved, she was

tolerating treatment well and she was not having any side effects.  Tr. 318.  Again, following her

fourth week of interferon treatment, although she reported pain, she was feeling better.  Tr. 321.

Her mood was variable but was getting better.  Tr. 321.  She sometimes became irritable but was

sleeping well with medication.  Tr. 321.  On November 20, 2007, psychotherapy assessment

notes reflect that Touart was "stable but stressed" and that she reported no side effects from her

current medication.  Tr. 321-322.  Following week five of treatment, Plaintiff's weight was at

101.5 pounds.  Tr. 323.  Her main complaints were feeling fatigued and diffuse body aches.  Tr.

323.  She exhibited no visible signs of infection or bleeding and her appetite was better.  Tr. 323.

Plaintiff's medical providers recommended that she continue with the treatment as planned.  Tr.

---

[5] Prior to October 2007, Touart had not been a candidate for hepatitis C treatment because of her alcohol use but, once sober, she was able to begin treatments. Tr. 200, 235.  Touart reported that she stopped drinking in April 2007. Tr. 236.

324.  Following her sixth interferon treatment, Plaintiff reported her mood had improved although initially she had been depressed.  Tr. 352.  She noted a number of social stressors including the loss of her home but she reported that she was managing.  Tr. 352.  On December 10, 2007, Plaintiff exhibited some thinning of her hair but was tolerating treatment.  Tr. 356.  Although Touart had initially experienced irritability and some flu-like symptoms, those symptoms had improved.  Tr. 356.  Her home situation and depression had improved; her brother was renting a house for her and her daughter to live in.  Tr. 356.  Plaintiff's medical providers again recommended that she continue with treatment as planned.  Tr. 357.

Notwithstanding some improvement, on December 21, 2007, after consulting with Dr. Kevin Mullen[6] via telephone Touart stopped the hepatitis C treatment.  Tr. 358, 364.  She was experiencing chills and shakes with the chills lasting for a couple of hours.  Tr. 358, 364.  She also reported that she felt that the hepatitis C medicine was making her sick (headaches, vision problems, dizziness and aggravation of back pain), giving her more wrinkles in her face and causing weight loss.  Tr. 358, 364.

Following a positive urine culture on January 4, 2008, Touart was treated for a urinary tract infection.  Tr. 358-361.  At a follow-up visit with Dr. Mullen on January 8, 2008, Touart weighed 95 pounds, 4.8 ounces.  Tr. 364.  During that visit, Dr. Mullen recommended that she see a neurologist.  Tr. 364.  On January 14, 2008, Touart saw neurologist Dr. Brian G. Dyko for her headaches.  Tr. 365.  On examination, she was alert, her speech was clear and her memory was intact.  Tr. 367.  Dr. Dyko indicated that Touart was still being treated for the urinary tract infection and that she had an elevated temperature.  Tr. 369.  He indicated that he believed that Touart's headaches were most likely from her urinary tract infection and he recommended that Touart follow up with her medical providers if her headaches did not improve once the urinary

---

[6] Dr. Mullen was Touart's primary care physician.  Tr. 399.

tract infection was resolved.  Tr. 369.  At a January 17, 2008, follow-up visit, Touart reported

that she had started to regain some of the weight that she had lost, her appetite was back, most of

her symptoms had resolved and she felt generally well without complaint.  Tr. 370.  Her doctors

recommended that she hold off on further interferon treatments at that time and follow up with

the liver clinic.  Tr. 373.

On March 31, 2008, at a follow-up visit with the liver clinic, Touart indicated that she

was fatigued, sleepy and forgetful.  Tr. 396.  However, on examination she was alert and

oriented.  Tr. 398.  She weighed 111 pounds, 14.4 ounces.  Tr. 398.  Her doctors discussed with

her the option of liver biopsy but Touart was not ready at that time.  Tr. 398.  Her doctors also

indicated that they would monitor her and, if they saw a significant change in her labs, the

doctors would strongly recommend that Touart resume treatment.  Tr. 398.  Touart's doctors

noted that, while Touart could not tolerate the interferon treatments, she had shown a great viral

response to the treatments.  Tr. 399.  Her doctors noted that, if treatments were started again,

they might lower the dose because of her weight.  Tr. 399.  Touart understood the plan and

indicated that she would undergo treatment if absolutely necessary.  Tr. 398.

### b. Mental Health

The records reflect that, as early as 2004, Touart received psychiatric treatment at

Metrohealth Medical Center.  Tr. 200-205.  In November 2004, Dr. Daniel Ionescu diagnosed

Touart with major depressive disorder, recurrent vs. alcohol induced mood disorder; alcohol

dependence; and possible marijuana dependence.  Tr. 205.  In April 2005, she was doing ok and

was happy with the way the medication was making her feel.  Tr. 206-207.  Dr. Ionescu

recommended that Touart continue with the same treatment.  Tr. 206-207.

On March 14, 2007, Plaintiff again sought psychiatric services.  Tr. 220.  She reported that she felt very depressed and empty, cried, had racing thoughts, and was sleeping poorly.  Tr. 220.  She was not suicidal.  Tr. 220.  A request for psychiatric services was made (Tr. 223) and, on April 3, 2007, Dr. Jasmine Maan saw Touart for a mental health assessment (Tr. 225).[7]  Dr. Maan assessed Plaintiff as stable but depressed.  Tr. 242.  Dr. Maan diagnosed Touart with major depression, recurrent not otherwise specified, and alcohol dependence.[8]  Tr. 242.  Touart reported no side effects from medication.  Tr. 242.  Dr. Maan recommended follow-up visits to prevent relapse.  Tr. 242.

On August 7, 2007, Touart saw Dr. Maan for medication follow-up and supportive psychotherapy.  Tr. 253.  Touart reported that she was doing worse.  Tr. 253.  Her boyfriend was in jail for stealing money and she was afraid that she was going to have to go through getting her interferon injections alone.  Tr. 253.  She noted that her boyfriend's daughter and mother had been helpful.  Tr. 253.  She had just had her birthday and had a good time.  Tr. 253.  She wanted to increase her Zoloft because she had been "stressed out."  Tr. 253.  Dr. Maan assessed Plaintiff as stable but depressed.  Tr. 254.  She increased Touart's Zoloft and noted that it would be decreased when the Plaintiff was feeling better.  Tr. 254.

A month later, Touart saw Dr. Maan and reported that she was feeling fine.  Tr. 256.  Dr. Maan again assessed Plaintiff as stable but depressed.  Tr. 256.  Dr. Maan continued the Zoloft but noted that she would need to follow more closely once Plaintiff started her interferon treatments.  Tr. 256.

---

[7] Dr. Maan continued to treat Touart for her mental health condition through 2008 when Touart transferred her care to Bridgeway.  Tr. 428, 430.

[8] At her March 14, 2007, assessment, Touart reported that she had been sober for 68 days and intended to stay sober.  Tr. 241.

On October 23, 2007, Touart saw Dr. Maan and again reported that she was feeling fine.[9] Tr. 307.  She discussed having some difficulties with her housing arrangements but also indicated that she was staying busy and having good social interactions.  Tr. 307.  Dr. Maan again assessed Plaintiff as stable but depressed.  Tr. 308.

On November 20, 2007, Touart saw Dr. Maan and again reported feeling fine.[10]  Tr. 321. She reported that her brother had rented a house for her and her daughter to live in.  Tr. 321.  She was pleasantly surprised by her family's support.  Tr. 321.  She reported having some irritability but also indicated that she was doing better and sleeping well with medication.  Tr. 321.  Dr. Maan's assessment remained the same; stable but depressed.  Tr. 322.

Treatment with Dr. Maan continued into 2008.  Tr. 362.  On January 8, 2008, Touart again saw Dr. Maan.  Tr. 362.  Touart reported being sick physically, including having bad migraines.[11]  Tr. 362.  She indicated that, even with the injections having stopped, she continued to have headaches.  Tr. 362.  She was tearful during her visit.  Tr. 362.  Notwithstanding Touart's reports of physical ailments, Dr. Maan's assessment remained the same; stable but depressed. Tr. 363.  She recommended a follow-up in 2 weeks.  Tr. 363.

As recommended, Touart saw Dr. Maan on January 22, 2008.  Tr. 375.  Touart reported feeling better physically but also indicated that she had been feeling depressed.[12]  Tr. 375. Although her energy was back, she did not feel like doing anything.  Tr. 375.  Dr. Maan continued to assess Plaintiff as stable but depressed.  Tr. 376.  She recommended that Touart

---

[9] Touart did report pain and Dr. Maan noted that Touart was seeing another medical provider for her pain.  Tr. 307.

[10] Touart did report pain and Dr. Maan noted that Touart was seeing another medical provider for her pain.  Tr. 321.

[11] Touart did report pain and Dr. Maan noted that Touart was seeing another medical provider for her pain.  Tr. 362.

[12] Touart did not report pain.  Tr. 375.

restart Zyprexa because Touart had been on that medication in the past and it had helped her mood.  Tr. 376.

On February 12, 2008, Touart returned to see Dr. Maan.  Tr. 400.  She reported doing worse; she was feeling anxious.  Tr. 400.  She no longer enjoyed shopping like she once did.  Tr. 400.  She was feeling better physically and doing more around the house.  Tr. 400.  Dr. Maan continued to assess Plaintiff as stable but depressed.  Tr. 401.

On April 4, 2008, Touart saw Dr. Maan and reported having mood swings and getting upset easily.  Tr. 394.  She was having difficulty sleeping.  Tr. 394.  Dr. Maan still assessed Plaintiff as stable.  Tr. 395.

During her May 8, 2008, visit with Dr. Maan, Touart was distressed from severe arthritis pain.  Tr. 390.  She reported that she was planning to see her medical doctor the following week and would discuss treatment options at that time.  Tr. 390.   Dr. Maan assessed Plaintiff as stable.  Tr. 390.

During her visit with Dr. Maan on June 19, 2008, Touart reported that her mood was good that day but that she had been doing worse.  Tr. 428.  She was stressed because of her daughter; Touart was taking care of her daughter's children. Tr. 428.  She indicated that sometimes she gets very upset, cries and yells at other people.  Tr. 428.  She stated that she wanted to transfer her care to Bridgeway because it was more convenient for her.[13]  Tr. 428.  Dr. Maan assessed Touart as stable but stressed.  Tr. 430.  As part of Touart's transfer to Bridgeway, Dr. Maan summarized the care, services and treatment provided to Touart.  Tr. 430.  Dr. Maan reported that Touart suffered from major depression and alcohol dependence, currently in remission, and she indicated that Touart had been stable on Zoloft and Zyprexa.  Tr. 430.

---

[13] A June 17, 2008, note in a Bridgeway "Adult Diagnostic Assessment" indicates that Touart wanted to transfer from Metro because she was "not getting any help from . . . [her] psychiatrist at Metro."  Tr. 465.

As part of an "Adult Diagnostic Assessment" prior to her actual transfer to Bridgeway, Touart indicated that she could not see herself taking care of her daughter, grandkids and working at that time – "[m]aybe in a couple years when the kids are a little older." Tr. 467. She stated that her mental issues had caused her problems at her past jobs. Tr. 467. She explained that one time she was fired for verbally attacking a co-worker. Tr. 467. She also indicated that, on some days, she is physically unable to sit up. Tr. 467. She reported that she had stopped using alcohol but continued to use marijuana three times per week. Tr. 468.

Following her transfer to Bridgeway, on July 17, 2008, an Individualized Service Plan was developed for Touart. Tr. 451-452. Touart's goal was to learn ways to maintain better control and to develop healthier communication. Tr. 451. During a July 23, 2008, psychiatric appointment, Touart reported that her sleep was fair, her mood remained variable, and she was irritable. Tr. 456. She was babysitting her grandchildren and remaining sober. Tr. 456. She was anxious and hyperactive with pressured speech and labile but it was noted that her mood was "not depressed." Tr. 456. On August 20, 2008, Touart was anxious, irritable and agitated. Tr. 449. She was worried about her grandchildren. Tr. 449. She was late for her appointment and was yelling and hostile. Tr. 449. Touart's physician changed her medication and discussed the change and treatment plan with Touart. Tr. 450.

In October 2008, Touart's sister was concerned about Touart's lack of compliance with medication and follow-up with her appointments. Tr. 445. Touart had not had medication for 3 months. Tr. 478. According to Touart's sister, Touart had been angry and manic. Tr. 445. In order to stabilize her condition, Touart was hospitalized. Tr. 445-446, 478. She was admitted on October 2, 2008, and discharged on October 11, 2008. Tr. 478-492. At discharge, her diagnosis was bipolar disorder. Tr. 478. Touart's goals were met and no services were needed. Tr. 478.

Touart was doing well and indicated her readiness for discharge and reduced stress, anxiety and depression. Tr. 479.

In January 2009, Touart had a brighter affect and was less labile. Tr. 500. She was pleasant and more focused. Tr. 500. In October 2009, Touart was still depressed and prone to crying but sleeping better and a little less angry. Tr. 497. Her doctors assessed her with bipolar disorder. Tr. 497. They had prescribed Seroquel the month before because of her increased irritability and Touart reported that she was tolerating the new medication. Tr. 497. She weighed 127 pounds. Tr. 497. A month later, she reported crying daily and being tired all the time. Tr. 496. She had lost 5 pounds. Tr. 496. On December 17, 2009, she indicated that the Seroquel was helping her sleep but that, ever since the interferon treatments in 2007, she always felt exhausted. Tr. 495. Her providers recommended that Touart continue with the same medication. Tr. 495.

On January 14, 2010, Touart was tearful, angry and labile. Tr. 498. However, her providers recommended that she continue with the same medication. Tr. 498. Later, in April 2010, Touart, although still labile, had an improved mood. Tr. 506. Her medication was continued. Tr. 506. On May 13, 2010, Touart appeared to be doing better. Tr. 505. Then, on June 10, 2010, Touart was calm and indicated that her household was less stressful because her daughter's boyfriend had moved out. Tr. 504. Her medication was continued. Tr. 504.

### c.     Other Medical Conditions

At a May 5, 2008, medical care clinic visit, Touart reported joint pain and generalized body aches, mainly in her extremities. Tr. 391-392. Touart denied numbness, tingling or weakness. Tr. 392. On examination, she generally appeared healthy, alert and not in distress. Tr. 392. Her doctors opined that Touart's symptoms were most consistent with osteoarthritis and

they recommended physical therapy.  Tr. 393.  On June 3, 2008, Touart began physical therapy and continued with therapy for six weeks.  Tr. 423-424, 425-427, 432-433, 434-435, 436-437, 440-443.  At her sixth physical therapy visit, Touart reported her pain level as 3/10 with her pain primarily being in her left shoulder.  Tr. 423.  She did also indicate that her low back pain increased with weather changes, slouching and reaching overhead.  Tr. 423.  Notwithstanding a recommended plan and referral for additional physical therapy visits (Tr. 424), on July 9, 2009, because Touart no showed for 4 consecutive physical therapy appointments, she was discharged from physical therapy (Tr. 422).  In May of 2008, Plaintiff acknowledged a lack of compliance with her medication for osteoporosis and was encouraged to at least take TUMs as a cheap source of calcium.  Tr. 385-388.  A January 4, 2008, x-ray showed "COPD. No acute cardiopulmonary disease." Tr. 334.

### 2.  Medical Reports/Opinions

#### a.  Treating Medical Providers

##### i.  Treating Psychiatrist Dr. Emil Ibrahim

On December 3, 2008, Dr. Emil Ibrahim completed a "Medical Source Statement: Patient's Mental Capacity" form wherein he rated Touart's ability to perform 21 "basic mental activities of work on a sustained basis."[14]  Tr. 493-494.  Of the 21 areas, Dr. Ibrahim rated only Touart's ability to understand, remember and carry out simple job instructions as "good." Tr. 494.  He rated her ability in 14 categories as "fair".  Tr. 493-494.  In the other six categories, he rated her ability as "poor or none" including her ability to: respond appropriately to changes in routine setting; work in coordination with or proximity to others without being unduly distracted

---

[14] The available ratings included: "unlimited or very good" – ability to function in this area is more than satisfactory; "good" - ability to function in this area is more than satisfactory; "fair" – ability to function in this area is seriously limited but not precluded – may need special consideration and attention; and "poor or none" – no useful ability to function in a competitive setting – may be able to perform in a sheltered setting.

or distracting; deal with work stress; complete a normal workday and work week without interruption from psychologically based systems and perform at a consistent pace without an unreasonable number and length of rest periods; behave in an emotionally stable manner; and relate predictably in social situations.  Tr. 493-494.  Dr. Ibrahim did not provide medical/clinical findings to support the assessment or other comments or limitations.  Tr. 494.

### ii.    Counselor Ellen Alaimo

On February 11, 2010, counselor Ellen Alaimo completed a "Medical Source Statement: Patient's Mental Capacity" form similar to the one Dr. Ibrahim completed.  Tr. 502-503.  Ms. Alaimo's assessment (Tr. 502-503) was less limiting than Dr. Ibrahim's assessment (Tr. 493-494).  She rated Touart's ability to "understand, remember and carry out simple job instructions" and "ability to leave home on own" as "unlimited/very good."  Tr. 503.  She rated Touart's ability to "maintain appearance" and mange "funds/schedules" as "good." Tr. 503.   In 11 categories, she rated Touart's abilities as "fair."  Tr. 502-503.  The 2 categories in which Counselor Alaimo rated Touart's abilities as "poor" were Touart's ability to "respond appropriately to changes in routine settings" and "deal with work stresses."  Tr. 502.   In support of her assessment, Ms. Alaimo stated that Touart had "bipolar II, depressed mood – poor concentration, labile emotions, over sensitive and reactive – unable to handle stress."  Tr. 503.

### b.    Consultative Examining Physician Dr. Mehdi Saghafi

On October 2, 2007, Dr. Mehdi Saghafi, M.D. conducted a consultative examination.  Tr. 273-278.  Following his examination, he opined that Plaintiff had degenerative arthritis multiple joints and residual, torn rotator cuff, left.  Tr. 274.  He concluded that Plaintiff can:

> sit, stand and walk 6-8 hours per day.  She does not need ambulatory aid.  She is
> able to lift and carry 5-10 pounds of weight on a frequent basis and lift and carry
> 11-25 pounds of weight on occasions.  She is able to push and pull lightweight
> objects.  She is able to manipulate objects.  She is able to operate hand and foot

controlled devices.  She is able to drive a motor vehicle and travel.  She is able to climb stairs on occasion.  Speech, hearing, memory, orientation, and attention are within normal range.

Tr. 274.

### c.    State Agency Reviewing Physicians

#### i.  Mental Impairments

On September 25, 2007, Dr. Vicki Casterline, Ph.D. completed a Psychiatric Review Technique.  Tr. 259-272.  Dr. Casterline opined that Touart suffered from depressive disorder but did not find that Touart's impairments met or equaled a Listing.[15]  Tr. 262.  Dr. Casterline found that Touart had only mild limitations in her ability to perform activities of daily living and in maintaining social functioning.  Tr. 269.  She also found that Touart had no limitations in her ability to maintain concentration, persistence or pace and that Touart had no episodes of decompensation.  Tr. 269.  Dr. Casterline concluded that the medical evidence of record did show that Plaintiff was experiencing stress.  Tr. 271.  However, she also found that Plaintiff's condition was stable and could be controlled with proper medication.  Tr. 271.  On February 19, 2008, Dr. Karla Voyten, Ph.D. reviewed the evidence and affirmed Dr. Casterline's September 25, 2007, assessment has written.  Tr. 378.

#### ii.  Physical Impairments

On October 5, 2007, Dr. Gerald Klyop, M.D. completed an RFC regarding Touart's physical abilities.  Tr. 279-286. He opined that Plaintiff could: lift/carry 50 pounds occasionally

---

[15] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

and 25 pounds frequently;[16] stand/walk for about 6 hours in an 8-hour workday; sit for about 6

hours in an 8-hour workday; and, except for the lift/carry restrictions, was unlimited in her

ability to push/pull.  Tr. 280.  Dr. Klyop also indicated that Touart could balance only

occasionally (Tr. 281) and her ability to reach in all directions with her left upper extremity was

limited to frequently (Tr. 282).  On February 21, 2008, Dr. Diane Manos, M.D., reviewed the

evidence and affirmed Dr. Klyop's October 5, 2007, assessment as written.  Tr. 379.

**C.     Testimonial Evidence and Function Reports**

      **1.     Touart's Function Report and Hearing Testimony**

           **a.  Touart's Function Report**

Plaintiff completed a Function Report wherein she described how her condition limits her

activities.[17]  Tr. 157-164.  Touart reported the following: She is now unable to work, perform

physical activities or lift.  Tr. 158, 162.  She is always sleepy and has difficulties understanding

and remembering things.  Tr. 158, 162.  She can pay attention for only 10-15 minutes but follows

written and oral instructions good.  Tr. 162.  She is able to perform household chores such as

laundry and cleaning.  Tr. 160.  She goes outside daily and, when she goes out, she walks or uses

public transportation.  Tr. 160.  She can walk about 3 miles before needing to stop and rest.  Tr.

162.  Every evening, she meets a friend for coffee at a coffee house.  Tr. 161.  She also attends

church meetings.  Tr. 161.  Her social activities had not changed since her

illness/injury/condition began.  Tr. 161.  She gets along with authority figures well but noted an

instance when she was fired from a job.  Tr. 162.  She indicated that she does not handle stress or

changes in routine well.  Tr. 163.

---

[16] Dr. Klyop noted that the consultative examiner had limited Plaintiff to lifting only 10 pounds frequently and 25
pounds occasionally but indicated that it was his opinion that the medical evidence of record demonstrated that
Touart was capable of performing activities within the limits of his RFC.  Tr. 285.

[17] The Function Report is undated.  Tr. 164.

### b.  Touart's Hearing Testimony

 Touart was represented by counsel and testified at the administrative hearing.  Tr. 19-34, 37-38.  The ALJ asked Touart about her work history and inquired as to why she had not worked in 2003, 2004 or 2005.  Tr. 19-21.  Touart indicated that, for awhile, her boyfriend was going to take care of everything for her.  Tr. 21.  Ultimately, she discovered that he was using drugs.  Tr. 21.  She indicated that, while she had problems in the past with cocaine and alcohol use, she had not used cocaine for 28 years and had been alcohol-free for 3 years.  Tr. 22.  She stated that she is unable to work because she cannot sit or stand for too long; she gets bad pains in the back of her neck.  Tr. 22, 26.  On certain days, her hands do not move right because of arthritis.  Tr. 24-25.  She discussed the problems she had while receiving interferon treatments, including her inability to walk.  Tr. 22-24.  She stated that, although she has never actually been treated for COPD, because her doctor advised her to quit smoking, she has cut down on her cigarette smoking from 20 to 8 cigarettes per day.  Tr. 38.

She is able to take care of her personal needs.  Tr. 25.  She resides with her daughter, her daughter's boyfriend and her daughter's three minor children.  Tr. 25.  She does laundry but her daughter brings the clothes downstairs and Touart stays downstairs while she does the laundry so she does not have to go up and down the stairs.  Tr. 25, 32.  She can wash dishes for about 15-20 minutes.  Tr. 32.  She socializes at a coffee house twice each week and has one friend who visits her at her house.  Tr. 30-31.  She can walk about 7 blocks before needing to rest.  Tr. 33.  Her brother drives her to the store so that she can do the grocery shopping.  Tr. 34.  She can take public transportation but indicated that it is a little difficult.  Tr. 33.

She does not take any medication for her pain but does take medication for her bi-polar disorder.  Tr. 26.  She still has stiffness and difficulty raising her arms over her head and her

neck still hurts her.  Tr. 34.  Her bi-polar medication helps her sleep because it reduces her racing thoughts but she still cries a lot; she is tearful every day.  Tr. 26-27, 32.  According to Touart, her 2008 hospitalization stemmed from her frustration with her daughter's lack of responsibility and sense of entitlement.  Tr. 28-29.  Following her hospitalization, her medication dosages increased but Touart stated that she believed that she needed a different type of medication.  Tr. 29.  She has not been in an argument with anyone in a long time.  Tr. 32.

### 2.  Tanya Bass' Third Party Function Report

On August 31, 2007, Touart's daughter, Tanya Bass, with whom Plaintiff resided, completed a "Function Report Adult Third Party" report.  Tr. 145-152.  Ms. Bass reported that Touart is able to perform laundry, cleaning and ironing.  Tr. 147.  She is able to care for herself. Tr. 147.  Ms. Bass assists with food preparation to allow her mother the ability to relax.  Tr. 147. Ms. Bass indicated that Touart goes out all the time and is able to go out alone.  Tr. 148.  She shops for food and clothing.  Tr. 148.  She reads every day and attends social gatherings every chance that she gets.  Tr. 149.  She visits friends' houses and attends doctor appointments.  Tr. 149.  Ms. Bass indicated that Touart cannot lift or reach above her head for too long and cannot lift anything heavy.  Tr. 150.  She stated that Touart is able to pay attention all the time and follows written and oral instructions very well.  Tr. 151.  She handles changes in routine very well but does not handle stress well.  Tr. 152.  She gets along with authority figures very well. Tr. 151.

### 3.  Vocational Expert's Testimony

 Vocational Expert Bruce Holderead ("VE") testified at the hearing.  Tr. 34-44.   The VE described Plaintiff's past work experience.  Tr. 35-37.  Her fast food manager position was a skilled, light exertional level position that Touart performed at the light level.  Tr. 35-36.  Her

housekeeping position was an unskilled light exertional level position that Touart performed at the light level.  Tr. 36, 37.  Her hospital cleaning position was an unskilled medium exertional level position that Touart performed at the light level.  Tr. 36.

The ALJ asked the VE to consider a hypothetical individual with the same age, education and work experience as Touart who:  can lift, carry, push or pull about 10 pounds frequently and 20 pounds occasionally; can sit about 6 hours and stand and/or walk about 6 hours; is limited to occasional climbing on ladders, ropes, or scaffolds and is limited to frequent reaching with the left non-dominant upper extremity; should not work around high concentrations of dust, fumes, gases, tobacco smoke or similar irritants; is limited to unskilled work involving only simple, repetitive tasks and not more than routine changes in the work place; is limited to low stress work meaning no high production quotas; and is limited to superficial interaction with co-workers and no interaction at all with the public in the performance of her job duties.  Tr. 39.  Based on that hypothetical, the VE testified that such an individual would be unable to perform Touart's past work as a fast food manager but would be able to perform both the housekeeping job and hospital cleaner job as she performed it, i.e., at the light level.  Tr. 40.

Next, the ALJ asked the VE to consider the same hypothetical with the additional limitation that the individual would also be off-task 20% of the time[18] due to psychiatric problems.  Tr. 40.  With that additional limitation, the VE stated that such an individual would be unable to perform Plaintiff's past work and there would be no other jobs available to such an individual in the economy on a competitive basis.  Tr. 40-41.

---

[18] To the extent that the hearing transcript states that the ALJ asked the VE about an individual being off task 100% of the time (Tr. 40), Plaintiff notes that, based on counsel's subsequent reference at the hearing to fact that the ALJ's hypothetical asked about an individual being off task for 20% of the time, this appears to be a typographical error. Doc. 13, p. 12, FN2.

Plaintiff's counsel then asked the VE whether there would be work available to an individual, with the physical restrictions noted by the ALJ, who responds to her supervisor or co-workers by crying no less than two times each week for approximately 10-15 minutes per occurrence.  Tr. 41-42.  The VE stated that such an individual would be capable of performing the Plaintiff's past housekeeping/cleaning work.  Tr. 43.  Plaintiff's counsel then asked whether work would be available to an individual who would be away from work two days each month due to psychological problems.  Tr. 43.  The VE could not definitively say that such a limitation would eliminate all work but also indicated that, if an individual was away from work three days each month, there would likely be no jobs available.  Tr. 43-44.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also* *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his April 2, 2010, decision, the ALJ made the following findings:

1.      Plaintiff was insured for a period of disability and disability insurance benefits on June 1, 2006, the alleged onset day, and remained insured through September 30, 2008.  Tr. 50.

2.      Plaintiff did not have substantial gainful activity since the June 1, 2006, alleged onset date.  Tr. 50.

3.      Plaintiff's severe impairments since the June 1, 2006, alleged onset date are: degenerative arthritis in multiple joints and low back; hepatitis C; residuals of a torn left rotator cuff; long-term and continuing tobacco abuse/chronic obstructive pulmonary disease; polysubstance

dependence/abuse (alcohol use in remission since April 2007 by Plaintiff's report); and an affective disorder variously described as depression and bipolar disorder.  Tr. 50-53.

4.  Since the June 1, 2006, alleged onset date, Plaintiff has not had an impairment or combination of impairments that has met or medically equaled a Listing. Tr. 53-54.

5.  Since the June 1, 2006, alleged onset date, and with the exception of briefer periods of less than 12 continuous months, Plaintiff has retained the residual functional capacity ("RFC") to perform work within the following parameters: she can lift and carry up to 10 pounds frequently and up to 20 pounds occasionally; she can sit with normal breaks for about 6 hours in an 8-hour period; she can stand or walk with normal breaks for about 6 hours in an 8-hour period; she can occasionally climb ladders, ropes or scaffolds; she can frequently (as compared to constantly) reach with her left (non-dominant) upper extremity; she cannot work around high concentrations of dust, fumes, gases, tobacco smoke or similar irritants; she is limited to unskilled work involving only simple, repetitive tasks and no more than routine changes in the workplace; she is limited to superficial interactions with co-workers and no interactions with the public in the workplace. Tr. 54-56.

6.  Since June 1, 2006, the alleged onset date, Plaintiff has been able to perform her past relevant work as a housekeeping cleaner, as generally performed and, as performed by Plaintiff in the past. Also, Plaintiff has been able to perform her past relevant work as a hospital cleaner as performed by Plaintiff in the past.  Tr. 56-57.

Based on the foregoing, the ALJ determined that Plaintiff has not been under a disability from June 1, 2006, the alleged onset date through the date of the decision.  Tr.  57.

## V. Parties' Arguments

### A.  Plaintiff's Arguments

First, Plaintiff argues that the ALJ's assessment of her RFC is not supported by substantial evidence because the ALJ failed to properly credit the opinion of the treating psychiatrist (Dr. Ibrahim) and treating counselor (Ellen Alaimo) and the ALJ's stated reasons for rejecting those opinions are insufficient.  Doc. 13, pp. 8-11.  Plaintiff asserts that the ALJ's RFC was not based on a current evaluation of the record and that the ALJ could have, but did not, call

a medical expert.  Doc. 13, pp. 8-9.  Plaintiff also asserts that the VE hypothetical, upon which the ALJ relied, did not contain specific limitations to address Plaintiff's moderate limitations in concentration, persistence or pace.  Doc. 13, pp. 12-13.  Plaintiff argues that the second hypothetical to the VE, which included a limitation that the worker would be off-task 20% of the time, should have been adopted by the ALJ and, if adopted, would have resulted in a finding that there was no work available to her.  Doc. 13, pp. 12-13.

Second, Plaintiff argues that the ALJ erred in failing to address the limitations and effects of Plaintiff's substantial weight loss and muscular atrophy resulting from her interferon treatments.  Doc. 13, pp. 12-15.  She argues that, while there is no specific Listing that addresses weight loss caused by interferon treatments, the ALJ should have considered Listing 5.08 as a comparative Listing.  Doc. 13, pp. 14-15.  Listing 5.08 relates to "weight loss due to any digestive disorder despite continuing treatment as prescribed, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive 6-month period."  20 C.F.R. pt. 404, Subpt. P., App. 1, Listing 5.08.

## B.    Defendant's Arguments

In response, the Commissioner argues that Plaintiff's argument regarding the ALJ's treatment of her treating psychiatrist's and treating counselor's assessments fails because those assessments are inconsistent with the record evidence as a whole and their own treatment records; neither was a "treating physician;" and the ALJ based his RFC on the record as a whole. Doc. 14, pp. 13-18.  The Commissioner asserts that the ALJ reviewed and discussed the evidence as a whole, including Plaintiff's mental health records and function reports.   Doc. 14, pp. 14-15. The Commissioner argues that Dr. Ibrahim had only seen Plaintiff three times and thus did not have a treatment history with Plaintiff sufficient to qualify him as a treating physician and that

Ellen Alaimo is not an "acceptable medical source" under the Regulations.  Doc. 14, p. 14, FN7.

Further, the Commissioner argues that, even if those assessments are deemed to be treating

source opinions, they are not supported by Plaintiff's own treatment records which show the

variability of Plaintiff's symptoms and which do not show the symptoms to be of the degree of

severity reflected in either of the assessments.  Doc. 14, pp. 16-18.  Respondent also argues that

the assessments conflict with Plaintiff's and her daughter's function reports.  Doc. 14, pp. 16-18.

In response to Plaintiff's argument that the ALJ did not properly consider her weight loss

and muscle atrophy, the Commissioner argues that Plaintiff's weight loss was only temporary;

that her weight loss was not the result of a digestive disorder, as Plaintiff concedes, and therefore

the criteria in Listing 5.08 are not applicable; and that there is no evidence to suggest that

Plaintiff's weight loss limited her functional abilities for a continuous twelve month period.

Doc. 14, p. 18.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992).  A court "may not try the case *de novo*, nor resolve conflicts in evidence,

nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.  The ALJ's assessment of Plaintiff's RFC and ultimate finding of no disability are supported by substantial evidence and, in assessing Plaintiff's RFC, the ALJ properly considered the medical opinions and Plaintiff's limitations in concentration, persistence or pace.**

1.       **The ALJ's decision not to provide controlling weight to Dr. Ibrahim's and Counselor Ellen Alaimo's assessments regarding Plaintiff's mental residual functional capacity is supported by substantial evidence.**

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2).   If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(c).  However, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

a.       **The ALJ properly considered Dr. Ibrahim's opinion**

The ALJ did properly consider Dr. Ibrahim's December 3, 2008, Assessment under the "treating physician" rule.  After fully considering the entire record, the ALJ concluded that Dr. Ibrahim's December 3, 2008, Assessment (Tr. 493-494) was not supported by the evidence as a whole (Tr. 52).  The ALJ concluded that there was no 12 month period since June 1, 2006,

during which the evidence showed that Touart's functioning was of the severity assessed by Dr. Ibrahim.  Tr. 52-53.  The ALJ's decision that Dr. Ibrahim's opinion was not supported by the evidence as a whole and therefore not entitled to controlling weight is supported by substantial evidence.

The ALJ cited to specific examples in the record which showed assessments of only mild or moderate difficulties.  Tr. 53 (citing Tr. 226 wherein psychiatrist Dr. Maan, on April 3, 2007, assessed Plaintiff with a GAF of 61-70;[19] and Exhibit 13F wherein, on June 17, 2008, Plaintiff was assessed a GAF of 60[20] (Tr. 473)).  Plaintiff takes issue with the ALJ's specific examples because his examples pre-date her October 2008, hospitalization.  Doc. 13, p. 10.  However, the ALJ did not disregard Plaintiff's 2008 hospitalization.  Tr. 52, 53.   Further, Plaintiff's October 2008 hospitalization was the result of Plaintiff's failure to take her medication for a period of 3 months (Tr. 478) and Plaintiff's medical treatment records consistently show that, while she suffered from depression, she remained stable (Tr.  254, 308, 322, 363, 376, 401, 390).   Even medical records as recent as 2010 do not show Touart's impairments to be as severe as reflected in Dr. Ibrahim's Assessment.  For example, in April 2010, Touart, although labile, had an improved mood (Tr. 506) and, on May 13, 2010, she appeared to be doing better (Tr. 505).  Then, on June 10, 2010, Touart was calm and indicated that her household was less stressful because her daughter's boyfriend had moved out.  Tr. 504.

---

[19] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

[20] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

24

As part of his analysis, the ALJ also considered the fact that Dr. Ibrahim's Assessment lacked citations to signs or symptoms in support of his opinion.  Tr. 53; 493-494.  Additionally, the ALJ considered the fact that Dr. Ibrahim had only seen Plaintiff a few times following her discharge from her hospitalization.[21]  Tr. 53.

The ALJ's explanation of his decision not to provide controlling weight to the severe limitations contained in Dr. Ibrahim's December 3, 2008, Assessment makes sufficiently clear the weight given to the treating physician's opinion and the reasons for that weight, *Wilson*, 378 F.3d at 544, and those reasons are supported by substantial evidence.  Accordingly, the undersigned finds no error in the ALJ's treatment of Dr. Ibrahim's opinion.

### b.  The ALJ properly considered Ellen Alaimo's opinion

Unlike Dr. Ibrahim, Ellen Alaimo is not a physician and the ALJ correctly noted that she is not an "acceptable medical source."  Tr. 53.[22]  Accordingly, the ALJ was not required to provide controlling weight to Ms. Alaimo's February 11, 2010, Assessment (Tr. 502-503).  However, the ALJ did in fact consider her opinion as an "other source" opinion and explained his reasons for not providing controlling weight to it.  20 C.F.R. § 404.1513; SSR 06-03P, 2006 WL 2329939, *6 (August 9, 2006).  The ALJ noted that Plaintiff did not have a significant history of treatment with Ms. Alaimo since Plaintiff's June 1, 2006, alleged onset date.  Tr. 53.

---

[21] The Commissioner separately argues that Dr. Ibrahim does not qualify as a "treating physician" because he only saw Plaintiff three times.  Doc. 14, p. 14.  The Commissioner is correct that a treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant.  20 C.F.R. § 404.1502.  However, since the ALJ properly assessed Dr. Ibrahim's opinion under the "treating physician" rule, it is not necessary for the undersigned to determine whether Dr. Ibrahim was in fact a treating source.

[22] Acceptable medical sources are-- (1) Licensed physicians (medical or osteopathic doctors); (2) Licensed or certified psychologists; (3) Licensed optometrists; (4) Licensed podiatrists; and (5) Qualified speech-language pathologists.  20 C.F.R. § 404.1513(a).

Further, he noted that Ms. Alaimo's opinions were not consistent with her own treatment records.  Tr. 53.

The ALJ properly considered the fact that Ms. Alaimo was not an acceptable medical source and not a treating physician and he explained his rationale for not providing her February 11, 2010, Assessment controlling weight.  Accordingly, the undersigned finds no error in the ALJ's treatment of Ms. Alaimo's opinion.

### c.  The ALJ did not err in not calling a medical expert

Plaintiff also argues that the ALJ erred by not calling a medical expert.  Doc. 13, pp. 8-9.  She argues that the ALJ should have called a medical expert because the ALJ rejected the state agency psychologists' opinions and Dr. Ibrahim's opinion.  Doc. 13, pp. 8-9.  For the reasons below, Plaintiff's argument is without merit.

An ALJ is not required to call a medical expert.  *Davis v. Chater*, 104 F.3d 361, *2 (6th Cir. 1996) (unpublished) (citing 20 C.F.R §§ 404.1527(f)(2), 416.927(f)(2)) (indicating that, where an ALJ has not abused his or her discretion, failure to call a medical expert does not preclude a court from finding substantial evidence to support an ALJ's decision).  Where the record contains sufficient evidence for an ALJ to decide a disability claim absent expert medical testimony, a failure to solicit expert medical testimony will not serve as a basis to reverse an ALJ's decision.  *See Williams v. Callahan*, 149 F.3d. 1185, *4 n. 3 (6th Cir. 1998) (unpublished) (finding that because the record contained the claimant's extensive medical history, the ALJ did not err in not soliciting expert medical testimony). Moreover, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe v. Comm'r of Soc. Sec.*, 342 F. Appx. 149,

157 (6th Cir. 2009).  "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Id.* (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)).

The ALJ had before him an extensive medical and non-medical record and his decision reflects the fact that full consideration was given to that record, including the various medical opinions, medical treatment records and Plaintiff's and Plaintiff's daughter's function reports. Accordingly, the undersigned finds that the ALJ did not err by not calling a medical expert.

### 2. The ALJ properly accounted for his finding that Plaintiff had no more than moderate difficulties in maintaining concentration, persistence or pace.

Plaintiff asserts that, because the ALJ did not incorporate in the RFC a limitation of being off-task 20%, the ALJ did not properly account for his finding that Plaintiff has no more than moderate limitations in maintaining concentration, persistence or pace.  Doc. 13, pp. 12-14. Plaintiff cites *Ealy v. Comm'r of Social Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) for the proposition that "[i]n order for a Vocational Expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." A review of the record and the ALJ's decision demonstrates that the ALJ did sufficiently convey to the VE those limitations that the ALJ found necessary to account for his finding that Plaintiff had no more than moderate limitations in maintaining concentration, persistence or pace.

The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 416.945(a)(3); 416.946(c), *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC"); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("an ALJ does not improperly assume the role of a

medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").  "Hypothetical questions . . .  need only incorporate those limitations which the ALJ has accepted as credible."  *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Having concluded that Plaintiff had no more than moderate limitations in concentration, persistence or pace, the ALJ, when assessing Plaintiff's RFC, explained the impact that Plaintiff's impairments would have on her work abilities.  Tr. 55.  He concluded that Plaintiff's "impairments could reasonably be expected to interfere with . . . her ability to perform complex work; and her ability to work with others."  Tr. 55.  Thus, as a result, the RFC limits Plaintiff to "unskilled work involving only simple, repetitive tasks and no more than routine changes in the workplace."  Tr. 54.  The RFC also limits Plaintiff to "superficial interactions with co-workers and no interactions with the public in the workplace."  Tr. 54.  In reaching his conclusions, the ALJ took into account, among other things, Plaintiff's ability "to engage in a fairly wide range of activities since June 1, 2006, that are incompatible with an individual having disabling symptoms."  Tr. 56 (referencing Tr. 145-152 (Tanya Bass' Third Party Function Report); Tr. 157-164 (Plaintiff's Function Report); and Plaintiff's hearing testimony).  He also considered the fact that her sporadic and limited work prior to her June 1, 2006, alleged onset date called into question her motivation to work since June 1, 2006.  Tr. 56; 21-22.

Although Plaintiff asserts that the ALJ should have relied upon the second hypothetical and incorporated a 20% off-task limitation, Plaintiff has failed to demonstrate that the first hypothetical question posed to the VE and the limitations incorporated into the RFC do not accurately portray Plaintiff's impairments; that those limitations do not reflect limitations found

by the ALJ to be credible; that those limitations are not supported by substantial evidence; or that greater limitations are required.   Accordingly, the undersigned finds that the ALJ did not fail to properly account for the limitations in Plaintiff's concentration, persistence or pace that he found to be credible and that are supported by substantial evidence.

> **3.       The ALJ's Step Four determination is supported by substantial evidence.**

Having concluded that the ALJ did not err in his RFC assessment, the undersigned also concludes that the ALJ's Step Four determination, i.e., that Plaintiff could perform past relevant work and, therefore, is not disabled, is supported by substantial evidence.   At Step Four, "a claimant will be found to be "not disabled" when it is determined that he or she retains the RFC to perform:

> 1.   The actual functional demands and job duties of a particular past relevant job; *or*
>
> 2.   The functional demands and job duties of the occupation as generally required by employers throughout the national economy."

SSR No. 82-61, 1982 WL 31387, * 2 (1982) (emphasis in original).  To determine whether a claimant can return to his past relevant work, an ALJ may rely on the services of a vocational expert as well as other resources such as the Dictionary of Occupational Titles.  20 C.F.R. § 404.1560(b)(2).

The ALJ agreed with the VE that Plaintiff could perform her past work as a housekeeping cleaner, as generally performed and as she performed it, and that Plaintiff could perform her past work as a hospital cleaner as she performed it.  Tr. 57.  The ALJ's reliance on VE testimony to support his determination that Touart can return to her past relevant work was proper and that determination is supported by substantial evidence.  Tr. 57.  Accordingly, the undersigned finds

that the ALJ's RFC and ultimate finding of no disability is proper and supported by substantial evidence.

**B.      The ALJ did not err by not specifically assessing, under Listing 5.08, Plaintiff's weight loss and muscular atrophy resulting from interferon treatments.**

Plaintiff argues that the ALJ erred in failing to address the limitations and effects of Plaintiff's substantial weight loss and muscular atrophy resulting from the interferon treatments. Doc. 13, pp. 12-15.  She argues that the ALJ should have considered Listing 5.08 dealing with weight loss due to a digestive disorder as a comparative Listing.  Doc. 13, pp. 14-15.  However, as argued by the Commissioner, Plaintiff has failed to point to evidence indicating that her temporary[23] weight loss while undergoing interferon treatments limited her functional abilities in such a way that her impairment could be said to equal or meet a Listing.  Doc. 14, p. 18.

Dr. Dyko's notes from a visit in January 2008 are contrary to Plaintiff's claim that her weight loss was disabling.  Tr. 365-368.  That visit followed Plaintiff's course of interferon treatments, when her weight had dropped to 97 pounds.  Tr. 365-368.  Dr. Dyko examined Plaintiff for complaints of headaches.  Tr. 365-368.  As part of that examination, he noted that she was alert, oriented, had clear speech and her memory was intact.  Tr. 367.  Also, while Dr. Dyko noted that Plaintiff exhibited generalized muscle atrophy, he indicated that she showed normal muscle tone and walked without difficulty.  Tr. 367-368.

In addition, Plaintiff concedes that there is no specific Listing that addresses weight loss caused by interferon treatments and that her weight loss was not the result of a digestive impairment.  Doc. 13, p. 14.  Moreover, the ALJ did consider a more relevant Listing.  Tr. 53.

---

[23] The records reflect that Plaintiff's weight loss was not permanent.  Tr. 396 (reflecting weight of 111 pounds, 14.4 ounces on March 31, 2008); Tr. 391 (reflecting weight of 114 pounds, 6.4 ounces on May 8, 2008).

He considered Listing 5.05 which pertains to chronic liver disease and concluded that Plaintiff's impairments did not meet or equal that Listing.[24]  Tr. 53.

Based on the foregoing, Plaintiff has failed to demonstrate that the ALJ erred at Step Three in assessing whether Plaintiff's impairments met or equaled a Listing.  Accordingly, the undersigned finds Plaintiff's argument that the ALJ erred by failing to address Touart's weight loss and muscular atrophy under Listing 5.08 to be without merit.

### VII. Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated:   May 6, 2013

_____
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[24] The ALJ also specifically referenced and considered Listings 1.02, 12.04 and 12.09 at Step Three.  Tr. 53.